UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| UNITED STATES | : | |
|---|---|---|
| | : | |
| *v.* | : | |
| | : | Criminal No. 14-0050(RC) |
| **JORGE PEREZ CAZARES,** | : | |
| | : | |
| *Defendant.* | : | |

**DEFENDANT'S RESPONSE TO GOVERNMENT'S
POST-HEARING BRIEF IN AID OF SENTENCING**

Defendant Jorge Perez Cazares, by and through undersigned counsel, respectfully submits his response to the government's post-hearing brief in aid of sentencing and states as follows:

**BACKGROUND**

The government moves the Court to impose a four-level leadership enhancement on Mr. Perez pursuant to U.S.S.G. § 3B1.1(a), based principally on comments he made on recorded conversations he had with government cooperator Marllory Chacon Rossell in late 2013 and early 2014. Mr. Perez' comments lack any corroboration and the government's motion should be denied.

**RESPONSE**

The government argues that Mr. Perez meets six of the seven factors set forth in U.S.S.G. § 3B1.1 app. n.4, and that therefore the Court should find that Mr. Perez is a leader or organizer meriting a 4-level enhancement. The government makes great leaps in trying to show Mr. Perez meets the factors; however, its attempts are not supported by the evidence.

### A. Mr. Perez Was Not a Leader or Organizer

#### 1. Exercise of Decision-Making Authority

The government claims that "on at least two occasions, during the charged conspiracy, the Defendant coordinated delivery of a shipment of cocaine to one of his Los Angeles-based employees, later identified as Gallardo-Sanchez." Gov. Br. at 21. What the government considers coordination was merely Mr. Perez providing Alfonzo Limon Sanchez ("Chubas") with a phone number that he (Chubas) requested. For example, on January 18, 2014, Chubas texted Mr. Perez: "We're at the office now my buddy so you can send me the number to give you yours." Mr. Perez responded: "Ok sir here I'm sending it to you …. 310 867 44 59 with hector from miguel please sir." Gov. Ex. 2. There is no evidence that a delivery of cocaine was made to the Los Angeles "office," or that Gallardo-Sanchez was an employee of Mr. Perez.

Likewise, the government makes a leap of logic when it describes Chubas as Mr. Perez's "partner" because they allegedly split a shipment of 166 kilograms. Gov. Br. at 21; Gov. Exh. 9. The most that can be said is that Mr. Perez and Chubas discussed dividing a shipment – there is no evidence regarding when the cocaine was purchased, from whom, what the terms were, whether the load was actually split and whether in fact Mr. Perez and Chubas were partners.

The government further argues that "Defendant commissioned Fernando Esquivel as an intermediary to secure an introduction to Chacon Rossell …." Gov. Br. at 22. All the evidence shows is that Esquivel was hoping to secure a commission from the deal between Mr. Perez and Chacon Rossell. Tr. at 160 – 161. There is no evidence that Mr. Perez "commissioned" or recruited Esquivel.

The government also claims that "Defendant's decision-making authority was further demonstrated by his proposal to give units of cocaine on credit (if we can front him 200 1ts more)." Gov. Br. at 22; Gov. Exh. 4.  This claim is based on a text message between Mr. Perez and Chubas on January 20, 2014, and the government conveniently leaves out the remainder of that text which reads in full: "if we can front him 200 1ts more *what do you think*." Gov. Exh. 4 (emphasis added).  Clearly, rather than making decisions, Mr. Perez was asking Chubas for his authorization.

The government further claims that when Mr. Perez and Chubas texted the following:

> Cadete:    "If she [Chacon Rossell] were willing to front us 1 whole one do I grab it?"
> Chubas:    "If they front you 2 grab them both we'll support each other here."

Gov't Ex. 6:5-6, it meant that "Defendant was consulting with and seeking the concurrence of his *equal partner* before taking on a debt of that magnitude."  Gov. Br. at 22.  However, in that exchange it is clear that Mr. Perez is seeking Chubas' authorization and he gives it, demonstrating that Chubas is the one making the decisions.

Finally, the government argues that, "Throughout the negotiations, the Defendant was in a position of decision-making authority regarding the quantity of cocaine he was seeking to purchase, price per kilogram, deciding the location where he would receive delivery, coordinating the overland transportation and logistics, etc. *See generally* Gov't Exs. 102-1A, 102-1T, 103-1A, 103-2A, 103-3T. Though he consulted with Limon-Sanchez throughout the negotiations, he was the one engaged in face-to-face negotiations with Chacon Rossell, representing himself as the voice of his DTO." Gov. Br. at 22.  The government's argument ignores that in almost all the communications between Mr. Perez and Chubas, Mr. Perez is

3

seeking Chubas' permission and authorization to act. *See, e.g.,* Tr. 94:6 – 95:16; Tr. 95:17 – 96:26; Tr. 105:8 – 106:11.

### 2. The Nature and Participation in the Commission of the Offense

With respect to this factor, the government argues that in recorded meetings with Chacon Rossell, "the Defendant described personnel he would employ to transport 500 kilos of cocaine from Guatemala to Culiacan and then to his employees in Los Angeles. *See* Evid. Hr'g Tr. 172:18-25, 173:1-9." Gov. Br. at 23. Multiple reads of the citation for this argument provided by the government fail to find any reference to a discussion about personnel to be used to transport 500 kilos of cocaine or any mention about his alleged "employees" in Los Angeles. The only instance mentioned by Chacon Rossell is a reference to "he says that one pilot would be *theirs*. Another one would be ours." Tr. 172:23 – 173:2 (emphasis added). This is a reference to a pilot being provided by the organization that Mr. Perez works for, rather than the pilot being provided by Mr. Perez himself.

The government next argues that although Mr. Perez was arrested driving the 500-kilogram load in Guatemala, he was "not expected to travel with the shipment." Gov. Br. at 23. That is beside the point. The fact is that Mr. Perez himself was driving the load accompanied by another person, about whom there is no evidence that he was an employee of Mr. Perez.

While, Mr. Perez does mention to Chacon Rossell, that he has someone in charge, this is an instance of him engaging in puffery to make himself look more important to Chacon Rossell. See Gov. Exh. 103-3T at 17:239; 19:260. For example, Chacon Rossell testified:

> Q. Now, in your long time dealing with drug traffickers and money launderers
> and people of that nature, you understand that they're not actually the most honest
> people; correct?

> A. That's right.
> Q. And you know that they can lie to get what they want; right?
> A. That's right.
> Q. And you can say that sometimes they're also good actors; right?
> A. That's right.
> Q. And sometimes they can say things to make themselves seem bigger than they are; correct?
> A. That's right.
> Q. Now, and they can say things to make you believe they can handle the quantity of drugs that you're supposedly selling; correct?
> A. That's right.
> Q. And in your case, you were trying to convince him that you could provide the drugs that he was looking to buy; right?
> A. That's right.

Tr. 274:3 – 22. The government itself conceded that Mr. Perez engaged in puffery to "inflate his status in the eyes of Chacon Rossell." Gov. Br. at 5 n.2. The same goes for Mr. Perez's supposed discussion about the use of violence to deter other from interfering with his operations or the use of armed personnel to transport drug loads and ability to employ aircraft. *See* Gov. Br. at 24. Chacon Rossell testified about events that happened in 2014, ten years prior to her testimony and was caught lying when she claimed that Mr. Perez had threatened her and her family. See Tr. 257:4 – 257:7; Tr. 257:8 – 257:17; 260: 18 – 261:23; Tr. 257:24 – 258:1; Tr. 259:17 – 259:19; Tr. 291:22 – 292:11. Beyond Chacon Rossell's suspect testimony, there is no corroboration for these claims. In fact, there is evidence that Mr. Perez was brokering the deal with Chacon Rossell on behalf of Chubas; that he was arrested driving the load; and that he requested the kilograms of cocaine without wrappers so he could count them one by one. Tr. 210:21 – 211:7; 272:1 – 272:4. Chacon Rossell testified that as a major trafficker she never counted each kilo one by one. Tr. 272:18 – 272:20. She also testified that that in her experience as a major drug trafficker she never personally transported drugs. Tr. 272:14 – 272:17.

5

### 3. The Recruitment of Accomplices

Without any basis in fact, the government claims that Mr. Perez recruited or employed Gallardo Sanchez in Los Angeles and also recruited the assistance of or commissioned the Esquivel brothers to facilitate an introduction to Chacon Rossell. Gov. Br. at 24. First, with respect to Gallardo Sanchez in Los Angeles, Agent Dvorsky testified that Mr. Perez had provided a telephone number associated with the Los Angeles seizures to Chubas, but that she was not aware of any other evidence indicating that Mr. Perez had any connection to the seizures or that California group. Tr. 121:7 – 121:10; 135:3 – 135:13. Therefore, the Los Angeles individuals could just as likely have been employees of Chubas or someone else. Second, regarding the Esquivel brothers, the evidence is that they expected a commission for the sale of the 500 kilograms of cocaine from Chacon Rossell to Mr. Perez - there is no evidence in the record that Mr. Perez recruited them or commissioned them.

The government also argues that the "Defendant left the handling of the narcotics to the personnel under his employment. He briefly described for Chacon Rossell the structure and organization of his U.S.-based operations, explaining that he had employees/subordinates who shield him during his operations." Gov. Br. at 23-24. It also argues that the "Defendant described the use of violence to deter others from interfering with his operations; the use of armed security to protect his shipments during transport; his access to and ability to employ aircraft in transport operations. Gov. Br. at 24. As noted previously, these comments were instances of puffery to make himself seem more important to Chacon Rossell.

### 4. The Claimed Rights to a Larger Share of the Fruits of the Crime

The government argues here that "there is a logical inference that (1) the Defendant and Limon-Sanchez were equal partners at the top of their organization, who (2)

logically derived far greater profit than the identified subordinates, *e.g.* the driver, Medina Ramírez, the primary Los Angeles-based stash house manager, Gallardo-Sanchez, and his subordinates, Virgen and Garcia." Gov. Br. at 26. Again, the majority of the intercepted Blackberry communications between Mr. Perez and Chubas demonstrate that Mr. Perez was an underling of Chubas, who routinely sought out Chubas' opinions and authorization to act in a certain way. There is no evidence in the record that Mr. Perez and Chubas were equal partners or that Mr. Perez derived a larger share of money from his activity. The government further argues that the "equal partner-equal investor" relationship is demonstrated in some of the intercepted Blackberry communications between Chubas and Mr. Perez. As a broker, it is quite possible to infer that Mr. Perez was also working on behalf of others when he discussed equal cocaine distribution with Chubas.

### 5. The Degree of Participation in Planning or Organizing the Offense

While Mr. Perez was involved in direct negotiations with Chacon Rossell, he did so as the broker for Chubas, who made the decisions about the deal such as what price to pay, where to pay and how much to buy. Mr. Perez may have been the "forward face" of the organization; however, he did not call the shots and ran everything he discussed with Chacon Rossell by Chubas for his opinion and approval.

### 6. The Nature and Scope of the Illegal Activity

The government claims that the "intricate and expansive nature of the Defendant's DTO operations, described in detail by the Defendant and supported by the evidence presented, the demonstrated lateral relationship to Limon-Sanchez and his admitted proximity to Zambada García, paints the picture of a competent, experienced trafficker with substantial

7

influence, access to resources, and status." Gov. Br. at 29-30. As discussed previously, beyond Mr. Perez's attempts at making himself seem bigger than he was in order to convince Rossell Chacon to deal with him, there is no evidence that he himself controlled an organization, let alone an individual. He was merely a cog in the machinery run by Chubas and his job in this conspiracy was to negotiate with Chacon Rossell on behalf of Chubas for the 500 kilograms of cocaine for which he was arrested in Guatemala. Thus, the nature and scope of the illegal activity for which he accepted responsibility was not necessarily extensive.

### 7. The Degree of Control and Authority Exercised Over Others

The government claims that Mr. Perez "exercised this requisite level of control over other identified members of the conspiracy." Gov. Br. at 30. For this proposition, the government points to Mr. Perez' alleged coordination with Chubas of a cocaine shipment to "Defendant's office manager," Gallado Sanchez. First, as was made clear in the evidentiary hearing, Mr. Perez on two occasions provided a telephone number at Chubas' request. That telephone number was associated with Gallardo Sanchez. However, the government's own witness, Special Agent Dvorsky, testified that she was not aware of any other evidence indicating that Mr. Perez had any connection to the seizures or that California group. Tr. 121:7 – 121:10; 135:3 – 135:13. The government cannot point to any evidence indicating that Chubas shipped any cocaine to the California group or that Mr. Perez controlled them.

Second, that Mr. Perez may have described leaving someone in charge, is, again, part of his puffery seeking to look more important to Chacon Rossell. Finally, the government claims that "the Defendant logically exercised control and authority over Medina Ramirez," Gov. Br. at 31, who was with Mr. Perez when they were both arrested by Guatemalan authorities in the truck containing the 500 kilograms of cocaine. There is no evidence that Medina was an

8

employee of Mr. Perez' or that Mr. Perez had control and authority over Ramirez. The most that can be said is that they were in the truck together and that Chacon Rossell never met Ramirez and thus has no information about him.

**B.     Mr. Perez Did Not Lead/Organize a Criminally Responsible Participant**

The government argues that "Defendant directed the actions of more than one criminally liable participant." Gov. Br. at 31. It supports this argument by claiming that Mr. Perez discussed an "employee who manages the 'office' in Los Angeles" when in negotiations with Chacon Rossell. *Id.* The government itself conceded that Mr. Perez engaged in puffery when discussing the Los Angeles operation to "inflate his status in the eyes of Chacon Rossell." Gov. Br. at 5 n.2. Additionally, Special Agent Dvorsky that Mr. Perez had provided a telephone number associated with the seizures to Chubas, but that she was not aware of any other evidence indicating that Mr. Perez had any connection to the seizures or that California group. Tr. 121:7 – 121:10; 135:3 – 135:13.

The government also argues that Mr. Perez "managed large-scale security operations, employing large numbers of armed personnel, telling Chacon Rossell that he generally paid $300,000 to protect each shipment." Gov. Br. at 31-32. The absurdity of this claim begs the question: If Mr. Perez controlled a large number of security personnel, why would he have to pay $300,000 to protect each load. Would he not just use his own guards who presumably were salaried employees?

**C.     The Criminal Activity Was Not Extensive**

Mr. Perez accepted responsibility for his conduct in negotiating a 500-kilogram cocaine deal with Chacon Rossell. The government attempts to enlarge the scope of Mr. Perez' conduct by claiming that his comments to Chacon Rossell during their meetings demonstrate that

9

he personally operated a large-scale drug trafficking operation of more than five participants. The record evidence demonstrates that Mr. Perez negotiated the deal on behalf of Chubas, who called the shots. Any mention by Mr. Perez of other operations or personnel were his attempt to make Chacon Rossell believe that he was a major trafficker so that she would deal with him. There is no corroboration for any claims by Mr. Perez to have a security apparatus, airplanes, or airstrips.

**WHEREFORE**, for the foregoing reasons and any others that may become apparent to the Court, Mr. Perez respectfully requests that the government's motion for a role enhancement be **DENIED**.

Dated: Washington, DC
September 4, 2024

**BALAREZO LAW**

By: /s/ A. Eduardo Balarezo
———————————————
A. Eduardo Balarezo, Esq.
DC Bar # 462659
400 Fifth Street, NW
Suite 300
Washington, DC  20004
Tel. (202) 639-0999
Fax. (202) 639-0899
E-mail:  aeb@balarezolaw.com

*Counsel for Jorge Perez Cazares*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of September 2024, I caused a true and correct copy of the foregoing Defendant's Response to Government's Post Hearing Brief in Aid of Sentencing to be delivered to the Parties in this case via Electronic Case Filing.

/s/ A. Eduardo Balarezo
_____
A. Eduardo Balarezo, Esq.