UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No.:  14-50 (RC) |
| | : | |
| JORGE HUMBERTO PEREZ CAZARES, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

**I.  INTRODUCTION**

Defendant Jorge Humberto Perez Cazares was arrested in Guatemala while transporting approximately 500 kilograms of cocaine purchased from an individual acting as a Drug Enforcement Administration ("DEA") informant.  He pled guilty to a one-count indictment charging him with conspiracy to distribute 5 kilograms or more of cocaine for importation into the United States.  The Government seeks application of several sentencing enhancements, including an aggravating role adjustment.  Defendant seeks the zero-point offender adjustment, as well as relief under the safety valve provision.  The Court held an evidentiary hearing on the aggravating role adjustment.  At this stage, the Court concludes that the Government has met its burden to demonstrate that Defendant operated as a leader or organizer meriting a four-level aggravating role increase.  As a result, Defendant is ineligible for adjustments under the zero-point offender and safety valve provisions.

**II.  FACTUAL BACKGROUND**

In 2013, a pair of drug traffickers introduced Defendant to a Guatemalan drug trafficker named Marllory Chacon Rossell, known then as "the Queen of the South."  Hearing Tr. at 34–35, ECF No. 67; Gov't Ex. 11.  Defendant, who is also known as "Cadete," first met with Chacon

Rossell in October 2013 in hopes of arranging the purchase of at least 500 kilograms of cocaine. Notice of Intent to Enter Plea of Guilty at 7, ECF No. 62. Defendant met with Chacon Rossell several more times in late 2013 and early 2014 to discuss the purchase. *Id.* In addition to the deal, the two spent hours discussing the drug trade and Defendant's drug trafficking organization. *See generally* Gov't Ex. 102-1T; Gov't Ex. 103-3T. Unbeknownst to Defendant, however, Chacon Rossell had been indicted in the Southern District of Florida and became a government witness. Hearing Tr. at 34. As part of that cooperation, Chacon Rossell agreed to capture audio and video recordings of her meetings, including those with Defendant. *Id.* at 81–82. In addition, federal agents gained access to Defendant's Blackberry communications with Alfonso Limon-Sanchez (a/k/a "Chubas"), a close affiliate of Ismael Zambada Garcia (a/k/a "El Mayo"). *Id.* at 90. Zambada Garcia "is accused of committing a raft of crimes as one of the two co-leaders of the Sinaloa Cartel, a drug trafficking organization based in Culiacan, Sinaloa, Mexico, which operates throughout the United States and Mexico." *United States v. Zambada Garcia*, 347 F.R.D. 301, 303 (W.D. Tex. 2024); *see also* Hearing Tr. at 90.

During his meetings with Chacon Rossell, Defendant discussed a wide range of topics related to his involvement in drug trafficking. These included the price of cocaine in other countries, *see* Gov't Ex. 102-1T at 12:207–13:229, working with other traffickers, *see id.* at 27:479–28:480, the proportion of cocaine he sold in Mexico versus the United States, *see id.* at 28:488–29:492, and the location of cash in both of those countries, *see id.* at 33. He discussed hiring security for drug shipments, *see* Hearing Tr. at 154, and the use of violence and murder to protect those shipments, *see id.* at 154, 247. Defendant also discussed the recent purchase of airplanes, related logistics, and flight times to Culiacan, Gov't Ex. 102-1T at 39:657–41:693, as well as the pace of drug sales, *see* Gov't Ex. 103-3T at 13:175, and organization of his operation

2

to "leave someone . . . in charge of all the other employees" to insulate himself, *see id.* at 19:260. In addition, Defendant discussed brands of cocaine he had recently purchased, including "Rolex, "RR," "Gold," and "H." Gov't Ex. 102-1T at 57:994; Gov't Ex. 103-3T at 21:303; Hearing Tr. at 205. Defendant contends that many of these statements were untrue and constituted puffery to gain credibility with Chacon Rossell.

Defendant exchanged messages with Limon-Sanchez throughout these negotiations, providing updates and seeking guidance. *See* Gov't Exs. 2–28. Defendant, for instance, coordinated the price and delivery of money for purchase of the drugs. *See* Gov't Ex. 8, Ex. 14, Ex. 17, Ex. 18, Ex. 25, Ex. 27. The messages also contained details regarding other drug deals, with Defendant asking Limon-Sanchez at what price drugs should be sold. *See* Gov't Ex. 5. In one such deal, Defendant and Limon-Sanchez appeared to equally split 166 kilograms of cocaine. *See* Gov't Ex. 9. Many of Defendant's messages struck a deferential tone, referring to Limon-Sanchez as "señor" or "sir," and asking Limon-Sanchez's permission or concurrence to proceed. *See, e.g.*, Gov't Ex. 8 (referring to Limon-Sanchez as "sir" and asking whether he agrees to timing and amount of cocaine purchase). Defendant additionally sent Limon-Sanchez his conversations with Chacon Rossell "so that [he] can see that everything is 100[%] sir." Gov't Ex. 20. As discussed below, the parties debate whether Defendant reported to Limon-Sanchez or the two operated as partners.

In the messages, Defendant also provided Limon-Sanchez with the phone number of an individual in California. *See* Gov't Ex. 18. United States law enforcement officers tracked the phone and discovered that it belonged to an individual named Jesus Gallardo-Sanchez. Hearing Tr. at 20, 59. Following further investigation, on February 17, 2014, United States law enforcement executed search warrants at three residences in Los Angeles, arresting three

3

people—including Gallardo-Sanchez—and seizing $1.4 million in cash and 74 kilograms of cocaine. Hearing Tr. at 58–63. Some of those cocaine bricks were marked with the labels "Rolex" and "RR." Hearing Tr. at 67–68; Gov't Ex. 200-29; Gov't Ex. 200-30; Gov't Ex. 200-31. Following these raids, Defendant changed his Blackberry PIN. Hearing Tr. at 127. In addition, on February 18—the day after execution of the search warrants—Defendant met with Chacon Rossell and discussed the raids. According to Defendant, he "was woken up" by his "Blackberry at seven in the morning" because "three of my offices . . . were busted." Gov't Ex. 103-3T at 4:40. He explained that he had seven "offices" in Los Angeles, and that police "hit three of them." *Id.* at 4:48–52.

Defendant nonetheless proceeded with the deal with Chacon Rossell, borrowing a truck that could transport 500 kilograms of cocaine. *See* Gov't Ex. 103-3T at 36:554–58. On February 22, 2014, Defendant picked up the cocaine from Chacon Rossell's employees. Hearing Tr. at 220. Acting on an anonymous tip, Guatemalan law enforcement officers intercepted Defendant with one other person traveling north in the truck. Hearing Tr. at 71–73. Upon inspection, the officers discovered 498 bricks of cocaine behind panels in the truck. *Id.* at 73. 484 of those packages tested positive for cocaine, totaling of 514.38 kilograms. Gov't Ex. 201-29T.

A grand jury in this district indicted Defendant on March 13, 2014, on one count of conspiracy to distribute 5 kilograms or more of cocaine for importation into the United States in violation of 21 U.S.C. § 959(a), 960 and 963, and 18 U.S.C. § 2. *See* Indictment, ECF No. 1. He entered United States custody on July 30, 2021. *See* Min. Order dated July 30, 2021. On April 1, 2024, Defendant entered a plea of guilty. *See* Notice of Intent to Enter Plea of Guilty, ECF No. 62; Min. Entry dated Apr. 1, 2024. The Court held evidentiary hearings on June 13–14,

2024, to resolve factual disputes related to application of the aggravating role adjustment. During those hearings, the Court heard testimony by Federal Bureau of Investigation Agent Jamie Dvorsky, *see* Hearing Tr. at 6, and DEA cooperating witness Marllory Chacon Rossell, *see id.* at 136.

### III.  LEGAL STANDARD

While the Sentencing Guidelines are no longer binding, "[s]entencing courts must nonetheless begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *United States v. Turner*, 21 F.4th 862, 864 (D.C. Cir. 2022) (cleaned up).  "[T]he government bears the burden of proof in seeking sentencing enhancements under the Guidelines, but the defendant bears the burden in seeking sentencing reductions."  *United States v. Keleta*, 552 F.3d 861, 866 (D.C. Cir. 2009).  Facts relevant to sentencing must generally be proven by a preponderance of the evidence.  See USSG §6A1.3, comment; *see also United States v. Watts*, 519 U.S. 148, 156 (1997) (per curiam).

### IV.  ANALYSIS

The Court first addresses the Government's request for an aggravating role adjustment pursuant to USSG §3B1.1, concluding that the adjustment is warranted.  Because the Government has carried its burden to show that the adjustment applies, this precludes application of the adjustment for zero-point offenders, *see* USSG §4C1.1, and the safety valve, *see* USSG §5C1.2.

#### A.  Aggravating Role Adjustment

The Government contends that Defendant played the role of an organizer or leader within a drug trafficking organization, and that the Court should apply a four-level increase under the aggravating role adjustment.  *See* Gov't's Post-Hearing Brief in Aid of Sentencing ("Gov't's

5

Br.") at 20, ECF No. 69.  Defendant argues that the adjustment is not warranted because he "worked under [Limon-Sanchez] as a broker," and "his role in the commission of the offense was limited to negotiating the 500-kilogram deal on behalf of [Limon-Sanchez]."  Def.'s Opp'n to Gov't's Mot. for Guideline Role Enhancement ("Def.'s Opp'n") at 12, 16, ECF No. 70.  The Court finds that the Government has carried its burden to show that Defendant operated as an organizer or leader.

Section 3B1.1 of the Sentencing Guidelines instructs a district court to increase a defendant's base offense level if he plays an "aggravating role" in an offense.  *See* USSG §3B1.1.  The provision provides for a four-level increase when "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  *Id.* §3B1.1(a).  A three-level increase is warranted when "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive."  *Id.* §3B1.1(b).  If the criminal activity involved fewer than five participants and was not otherwise extensive, the Guidelines call for a two-level increase.  *See id.* §3B1.1(c).  The Sentencing Guidelines direct the Court to consider

> [1] exercise of decision-making authority, [2] the nature of participation in the commission of the offense, [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others.

*Id.* §3B1.1, comment. (n.4).  "No single factor is dispositive, but all defendants receiving the enhancement 'must exercise some control over others.'"  *United States v. Bikundi*, 926 F.3d 761, 801 (D.C. Cir. 2019).  "There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."  USSG §3B1.1, comment. (n.4).  "'The magnitude of the enhancement varies with the culpability of the defendant,' as well as the scope of the criminal activity."  *United States v. Vega*, 826 F.3d 514, 538 (D.C. Cir. 2016) (citation

6

omitted) (quoting *United States v. Graham*, 162 F.3d 1180, 1182–83 (D.C. Cir. 1998)). "The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of §1B1.3 (Relevant Conduct) . . . and not solely on the basis of elements and acts cited in the count of conviction." USSG Ch.3 Pt.B, intro. comment. In sum, to apply the three- or four-level increase, the Government must prove by a preponderance of the evidence that Defendant (i) managed, supervised, organized, or led (ii) at least one "participant" who was criminally responsible for an offense (iii) in a criminal activity that involved five or more participants or was otherwise extensive. *See Vega*, 826 F.3d at 539.

The parties debate whether Defendant partnered with Limon-Sanchez or instead worked at his direction. *See* Gov't's Br. at 22; Def.'s Opp'n at 15–16; Gov't's Reply in Supp. of Post-Hearing Br. ("Gov't's Reply") at 1–4, ECF No. 72; Defendant's Resp. to Gov't's Post-Hearing Br. ("Def,'s Resp.") at 2, ECF No. 73. The evidence points in both directions. The parties discuss Blackberry messages indicating that the two planned to split a purchase of 166 kilograms of cocaine, *see* Gov't's Br. at 26, their equal financial investments in the 500-kilogram shipment, *see id.*, and, on the other hand, Defendant's deferential tone and consistent requests to Limon-Sanchez for permission to proceed, *see* Def.'s Resp. at 2; *see also* Gov't Ex. 6 (asking Limon-Sanchez whether to accept cocaine on credit, and offering to call if he has questions for Limon-Sanchez). Defendant's position as an equal partner or underling to Limon-Sanchez provides some context for his role, but it is not key to the inquiry imagined by §3B1.1. The four-level enhancement is not limited solely to defendants in the apex position of a criminal scheme, as multiple individuals can qualify as leaders and organizers. *See* USSG §3B1.1, comment. (n.4). Instead, the relevant factors indicate that the inquiry revolves around the defendant's management of others further down in the hierarchy rather than the existence of levels of

management that exist above him. *See United States v. Johnson*, 64 F.4th 1348, 1352 (D.C. Cir. 2023) ("We understand the concept of 'control' or 'authority,' implicit in the notion of 'management' or 'supervision,' to connote some sort of hierarchical relationship, in the sense that an employer is hierarchically superior to his employee."). The Government's evidence and the testimony elicited at the hearing establish that it is more likely than not that Defendant exercised control over others and played a significant role in planning a broad scope of illegal activity.[1]

First, the evidence shows that Defendant recruited and controlled accomplices who themselves engaged in criminal acts. Defendant recruited Chacon Rossell and others as accomplices to the trafficking of cocaine into the United States, although he did not directly control those individuals. *See United States v. Thompson*, 210 F.3d 855, 861 (8th Cir. 2000) (affirming application of enhancement in part based on Defendant trafficker's "recruit[ment of] a supplier"). But the evidence indicates that he did directly control others. Defendant stated that he recruited and paid security guards for his shipments, as well as pilots to fly aircraft. *See* Hearing Tr. at 153–54, 172–37, 247. Defendant also asserted that he had "two working teams"

---

[1] Defendant argues, at the outset, that Chacon Rossell's testimony at the evidentiary hearing was not credible. *See* Def.'s Opp'n at 11. At the hearing, Chacon Rossell testified that Defendant had conveyed death threats to her and her family through a third party. *See id.* (citing Hearing Tr. at 257–61). Chacon Rossell claimed that she told the Government about these threats at the time, *see* Hearing Tr. at 257, but the Government has no record or other corroboration of the threat, *see id.* at 259. Defendant thus claims that Chacon Rossell "lied about the death threats and those lies are evidence of her bias for the government, from which she hopes to get a visa to remain in the United States." Def.'s Opp'n at 11. As such, her testimony about Defendant "should be disregarded." *Id.* As the analysis below shows, the Court need not rely on Chacon Rossell's impressions to reach its conclusions. The Court instead relies primarily on Defendant's own recorded statements, his communications with Limon-Sanchez, and photographs documenting his arrest and the raids in California to determine whether the Government has carried its burden.

in the United States to operate "offices" there.[2]  Gov't Ex. 103-3T at 6:79–81.  He contended that he would "leave someone in charge" of those operations "and that person [was] in charge of all the other employees," to serve as a buffer to shield his own role.  Gov't Ex. 103-3T at 19:258–60.

The Court is concerned that some of Defendant's statements may have represented exaggerations intended to impress Chacon Rossell.[3]  Yet other evidence in the record supports the conclusion that Defendant did control the operations in California.[4]  First, cocaine bricks discovered during the Los Angeles raids contained the brand markings of drugs Defendant stated he had previously purchased, including "Rolex" and "RR."  Gov't Ex. 102-1T at 57:994; Gov't Ex. 103-3T at 21:303; Hearing Tr. at 67–68, 205; Gov't Ex. 200-29; Gov't Ex. 200-30; Gov't Ex. 200-31.  Second, Defendant himself provided Limon-Sanchez the phone number of Gallardo-Sanchez, who was discovered to distribute cocaine in connection with the stash houses.  *See* Gov't Ex. 18 at 1:1.  Third, Defendant knew of the raids by the next day, knew exactly how many locations law enforcement had raided, and changed his Blackberry PIN, demonstrating that others felt the need to inform him of the events with haste.  Gov't Ex. 103-3T at 4:40–52; Hearing Tr. at 127; *see also* Hearing Tr. at 271 (Chacon Rossell agreeing that a leader would be aware of seizures occurring at his stash houses).  Fourth, messages indicating that Defendant had previously divided drug purchases with Limon-Sanchez, *see* Gov't Ex. 9, and may have planned

---

[2] Operation of these offices to distribute cocaine in the United States represents relevant conduct because additional drug trafficking crimes governed by USSG §2D1.1 would be subject to grouping under USSG §3D1.2(d).  *See* USSG §1B1.3(a)(2) (defining relevant conduct).

[3] For this reason, the Court has not yet decided whether Defendant's discussion of aircraft and the employment of violence suffices to carry the Government's burden regarding specific offense characteristics under USSG §2D1.1(b).

[4] In light of this evidence, Defendant's argument that the three stash houses in Los Angeles belonged to someone else is not plausible.  *See* Def.'s Opp'n at 14.

to split the purchase from Chacon Rossell as well, *see* Gov't Ex. 6 at 1:6 (Limon-Sanchez telling Defendant to take cocaine of credit, saying "we'll support each other here"), lend credibility to the notion that Defendant was no mere broker but instead operated his own cocaine trafficking operation.[5]

In the course of controlling these operations, it is more likely than not that Defendant held authority over at least one individual who committed a criminal offense, satisfying the first element the D.C. Circuit identified in *Vega*. *See Vega*, 826 F.3d at 539. Three individuals, including Gallardo-Sanchez, were arrested during raids of three of Defendant's offices in California, and Defendant stated he had seven offices total. Defendant also stated that he hired security and pilots, although the Court recognizes there is no independent evidence that he did so. *See United States v. Bapack*, 129 F.3d 1320, 1325 (D.C. Cir. 1997) ("[A] party who gives knowing aid in some part of the criminal enterprise is a 'criminally responsible party' under the Guidelines." (quoting *United States v. Hall*, 101 F.3d 1174, 1178 (7th Cir. 1996)).

The third element the D.C. Circuit specified in *Vega* requires that the criminal activity "involved five or more participants or was otherwise extensive." *See Vega*, 826 F.3d at 539. The Court counts Defendant, Limon-Sanchez, the two drug traffickers who introduced Defendant to Chacon Rossell, the truck driver, Gallardo-Sanchez and two accomplices in California, other unknown individuals operating four remaining stash houses in California, security guards, and pilots among potential participants in the offense, rendering it more likely than not that the conspiracy involved five or more participants. It is additionally apparent, based

---

[5] In light of these indications that Defendant controlled the cocaine trafficking operation in California, the Court is not convinced that he lacked a connection to the seizures simply because he discussed a higher amount of drugs and money with Chacon Rossell. *See* Def.'s Opp'n at 14. The parties agree that Defendant may have, at times, engaged in "puffery" to impress her. *See* Def,'s Resp. at 4–6; Gov't's Br. at 5 n.2.

on the number of actors involved, the volume of drugs at issue, and the geographic reach of the conspiracy, that the criminal activity was "otherwise extensive" in a manner supporting application of the adjustment.  *See* USSG §3B1.1(a); *see also Vega*, 826 F.3d at 540 ("[T]he Guidelines' "otherwise extensive" inquiry pertains to the scope of the criminal activity as a whole, not the defendant's particular involvement in it."); *United States v. Wilson*, 240 F.3d 39, 49 (D.C. Cir. 2001) ("[A]t a minimum, Section 3B1.1's 'otherwise extensive' prong demands a showing that an activity is the *functional equivalent* of an activity involving five or more participants." (internal quotations omitted)).

The last issue regarding this adjustment is whether Defendant operated as a manager or supervisor; an organizer or leader; or none of these.  *See Vega*, 826 F.3d at 538–39.  Again, the Sentencing Guidelines commentary provides the relevant factors for the Court to consider.  *See* USSG §3B1.1, comment. (n.4); *see also Graham*, 162 F.3d at 1185 n.5 (stating that these factors may be used to distinguish participants from managers, as well as managers from leaders).  As discussed above, the evidence establishes that Defendant recruited numerous accomplices and exercised control over several, based on his own statements and corroborating evidence, to the degree of an organizer or leader.  In addition, while Defendant's authority to make independent decisions regarding the deal with Chacon Rossell may have been somewhat constrained, his statements indicate that he oversaw his own apparatus for transportation of drugs into the United States.  *See* Gov't Ex. 102-1T at 39:658 ("*I* just bought two airplanes." (emphasis added)); Gov't Ex. 103-3T at 4:40 ("[T]hree of *my* offices . . . were busted." (emphasis added)).  It is also noteworthy that Defendant appears to have used these participants to limit his own exposure to criminal liability.  *See* Gov't Ex. 103-3T at 17:239, 19:258–60.

So too do the nature of Defendant's participation in the offense and his planning and organization demonstrate his "higher level managerial and supervisory conduct." *United States v. Quigley*, 373 F.3d 133, 139 (D.C. Cir. 2004). Defendant worked closely with and sought concurrence of an individual with close connections to an alleged head of the Sinaloa cartel. *See* Hearing Tr. at 90. Defendant was in the driver's seat for the contact with Chacon Rossell, price negotiations, and arrangement of payment, and he retained significant discretion to complete the deal for $4 million worth of cocaine, some of which he may have intended to keep for himself. *See* Gov't Ex. 6 at 1:4 (Limon Sanchez stating "I'll leave it to you if you're able to arrange a relationship"); Gov't Ex. 13 (Defendant setting the time of delivery in Tijuana); Gov't Ex. 103-3T at 36:554–558 (Defendant arranging to borrow truck from Chacon Rossell); *see also* Gov't Ex. 5 at 1:1–2 (Limon-Sanchez responding "it's up to you" when Defendant asks about pricing in separate deal). He also appeared to have access to his own large sums of money to move forward with the deal. *See* Gov't Ex. 25 at 1:2 (explaining that Defendant had $2 million in Tijuana). Defendant's authority over the deal was not absolute, however, as Defendant sought the agreement of Limon-Sanchez in their messages. *See* Gov't Ex. 8 (Defendant asking Limon-Sanchez's input on timing and accepting cocaine on credit); Gov't Ex. 13 (Defendant asking Limon-Sanchez for prevailing purchase price); Gov't Ex. 18 (Defendant asking Limon-Sanchez for thoughts on quantity and purchase price); *see also* Gov't Ex. 4 at 1:3–4 (asking permission to provide drugs on credit in a separate deal). The evidence nonetheless indicates that Defendant played a central role in organizing the deal, its financing, and transportation of drugs north.

The nature of Defendant's participation in the offense is also aggravated by his efforts to convince Chacon Rossell to expand her operations into Mexico, which he understood to have demand for further cocaine. *See* Gov't Ex. 102-1T at 38:639–39:656. He suggested that Chacon

Rossell "send [him] an airplane . . . [t]o Culiacan" over which he would "take responsibility." *Id.* at 39:666–40:668. He further "offer[ed] [Chacon Rossell] a place where [he] can protect [her] merchandise for [her]," such that it "won't be lost." *Id.* at 39:672, 39:674. It is not credible that these offers to Chacon Rossell, a powerful drug trafficker, represented puffery by an individual without authority to carry them out. The statements further evidence Defendant's role in high-level organization of the drug trafficking conspiracy. In sum, the nature of Defendant's participation and his organizational role imply that he operated as a leader and organizer who nonetheless required clearance from the highest levels of the conspiracy.

    Defendant argues that the nature of his conduct—including driving the truck, counting the cocaine bricks, and operating as a broker—indicates that he was not a manager or organizer. *See* Def.'s Opp'n at 15. Agent Dvorsky testified, for instance, that a high-level individual within a drug trafficking organization typically would not drive his own drugs. *See* Hearing Tr. at 123. Chacon Rossell additionally testified that she—"in [her] experience as a major drug trafficker"—never personally drove drug shipments or counted each kilogram of cocaine one by one. Hearing Tr. at 272. These points demonstrate that Defendant did at times carry out duties within the criminal conspiracy that may be more regularly assigned to a subordinate.[6] Yet personally surveying the drugs and accompanying them during transport is not inconsistent with a leadership role. *See, e.g.*, *United States v. Dodd*, 210 F. App'x 556, 558 (8th Cir. 2007) (affirming enhancement where defendant personally purchased and transported drugs, which he packaged and supplied to dealers). Again, the four-level aggravating role enhancement does not require a defendant to occupy the apex position in a conspiracy, but rather lead others or play a

---

[6] Chacon Rossell's contemporaneous communications with the DEA indicate that Defendant told Chacon Rossell he had never accompanied the drugs before, indicating that this was a rare occurrence. *See* Gov't Ex. 35 at 2:13–15.

13

central role in organizing the illegal activity. That Defendant may have performed some non-leadership duties does not negate his other relevant conduct—such as the negotiation of a multimillion-dollar cocaine deal and operation of stash houses in the United States.

Defendant also argues that the Government has, at times, characterized him as a "broker" rather than as a manager or leader. Def.'s Opp'n at 15; *see also* Hearing Tr. at 115–19 (discussing Defense Exhibits 20 and 21). Indeed, Defendant's statements indicate that he operated as a form of independent contractor who had multiple "clients." Gov't' Ex. 102-1T at 30:521. Defendant does not explain, however, how the Government's use of the label "broker" precludes him from serving as an organizer and leader of drug trafficking activity. A broker's core purpose is to negotiate deals and organize transactions. As the Court previously observed, the evidence indicates that Defendant played a central role in organizing the transaction with Chacon Rossell. Defendant's relevant conduct additionally includes activity outside the scope of his role as a broker, as the evidence indicates that he operated his own cocaine trafficking operation with seven stash houses in the United States. The nature of Defendant's conduct thus weighs in favor of the adjustment.

Furthermore, the nature and scope of the overall illegal activity supports application of the adjustment. "The Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility." USSG §3B1.1, comment. (backg'd). In coordination with an individual tied to the Sinaloa Cartel, Defendant arranged payment of $4 million and a shipment of more than 500 kilograms of cocaine. Hearing Tr. at 212. In total, Defendant hoped to receive 1,830 kilograms of cocaine. *See* Gov't Ex. 18 at 1:5–6. Defendant also claimed to have access to capital sufficient to purchase 5 or 6 tons of cocaine, spread across Mexico and the United States. *See* Hearing Tr. at 171–72; Gov't Ex.

102:1T at 33:565–67.  That claim is credible given Defendant's separate communications with Limon-Sanchez suggesting use of $2 million located in Tijuana "so as not to move what we have in" Mexico City.  Gov't Ex. 25 at 1:2.  Defendant's activities reached across at least three countries, including Guatemala, Mexico, and both the eastern and western United States.  He described his organization's use of security, Hearing Tr. at 247, deployment of violence to deter theft of shipments, *see id.* at 154, and access to airstrips, *see* Gov't Ex. 102-1T at 39:658.  This evidence indicates that the organization was large, and that Defendant bore significant responsibility for its actions.

Finally, the Court observes that the record lacks significant evidence that Defendant received a larger share of the fruits of the criminal activity.  The Government's argument boils down, in part, to the circular assertion that defendant is a leader because he must get a larger share of the profits because he is a leader.  *See* Gov't's Br. at 26–27.  It is not unreasonable to assume that Defendant received a significant share of the profits arising from splitting cocaine purchases with Limon-Sanchez.  *See* Gov't Ex. 6; Gov't Ex. 9.  Yet without further evidence of the broader scheme and Defendant's assets, assigning weight to this factor would rely on too much speculation.

Viewing these factors on the whole, it is more likely than not that Defendant played a key role in the trafficking of drugs from Central America into the United States.  The evidence demonstrates that Defendant had access to significant sums of money and regularly trafficked large amounts of drugs into the United States.  The evidence also shows that he had his own independent infrastructure to do so, and that he personally controlled numerous stash houses in the United States containing large amounts of drugs and money.  He had authority to negotiate for millions of dollars' worth of drugs at a time and split those drugs with a co-conspirator.

Taken together, the evidence supports the conclusion that Defendant operated as an organizer or leader within the higher levels of a drug trafficking operation. The scope of the conspiracy and his leadership role are at least as great as those of other drug trafficking defendants that courts have found to merit the four-level aggravating role adjustment. *See, e.g.*, *United States v. Burris*, 22 F.4th 781, 787 (8th Cir. 2022) (affirming four-level enhancement where defendant traveled to another country to negotiate sales and distribution of cocaine in United States and directed activities in the United States); *United States v. Bartley*, 230 F.3d 667, 674 (4th Cir. 2000) (affirming four-level enhancement where defendant "arrang[ed] the logistics of [cocaine] deliveries or payments," and at the very least "coordinate[d]" the activities of others (quoting *United States v. Vargas*, 16 F.3d 155, 160 (7th Cir. 1994)); *United States v. Parra-Mercado*, 192 F. App'x 886, 893 (11th Cir. 2006) (affirming enhancement even though another individual may have been considered a leader, where evidence showed that defendant was a planner rather than "a courier or errand boy"); *United States v. Mims*, 122 F.4th 1021, 1034–35 (8th Cir. Dec. 9, 2024) (affirming enhancement where defendant recruited drug couriers, insulated himself from risk, and took share of profits from couriers); *United States v. Tupper*, 644 F. App'x 585, 588 (6th Cir. 2016) (affirming enhancement where conspiracy involved at least six participants and defendant arranged multiple large cross-country drug shipments, exercised decision making authority over drug delivery, and recruited another to insulate herself from criminal exposure).

### B. Zero-Point Offender and Safety Valve

Defendant seeks application of the zero-point offender adjustment, *see* USSG §4C1.1, as well as the safety valve, *see* USSG §5C1.2. Defendant bears the burden to show that he is entitled to these sentence reductions. *Keleta*, 552 F.3d at 866.

16

Amendment 821 added §4C1.1 to the Sentencing Guidelines, which is an "Adjustment for Certain Zero-Point Offenders." USSG Supp. App. C, Amdt. 821 (effective Nov. 1, 2023). A defendant that meets all eleven criteria listed in §4C1.1 is entitled to a 2-level decrease in offense level. *Id.*; §4C1.1. Although Defendant satisfies many of these criteria, he does not meet the tenth requirement, which states that the defendant must not have received "an adjustment under §3B1.1 (Aggravating Role)." §4C1.1(a)(10). Because—as established above—the Court applies an aggravating role adjustment, Defendant is ineligible for the zero-point offender adjustment.

The Sentencing Guidelines also provide for a limitation on applicability of statutory minimum sentences in certain cases. That provision allows a court to "impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence" if five requirements are met. *See* USSG §5C1.2(a). One of those requirements is that "the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines." *Id.* §5C1.2(a)(4). Once again, because the Court determined that Defendant operated as an organizer or leader of others in the offense, Defendant is not eligible for a sentence below the statutory minimum under §5C1.2.

## V.  CONCLUSION

For the foregoing reasons, the Court concludes that the Government has carried its burden to demonstrate that Defendant's conduct merits a four-level aggravating role adjustment pursuant to USSG §3B1.1. As a result, Defendant is ineligible for the adjustment for zero-point offenders, *see* USSG §4C1.1, or the safety valve, *see* USSG §5C1.2.

Dated:  January 28, 2025                                                                                   RUDOLPH CONTRERAS
                                                                                                                              United States District Judge