## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 14-CR-050 (RC)** |
| **v.** | |
| **JORGE HUMBERTO PEREZ CAZARES,** also known as "Cadete," | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States, by and through its undersigned attorney, respectfully submits this sentencing Memorandum in advance of the sentencing of Jorge Humberto Perez Cazares, also known as "Cadete" ("the Defendant"), which is scheduled for June 9, 2025, at 10:00 a.m.

For the reasons set forth herein, the Government requests that this Court sentence the Defendant to 360 months of imprisonment, five years of supervised release, and a mandatory $100 special assessment. The recommended sentence is the low end of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range as calculated by the Government, which is 360 months to life.

## I.    OFFENSE CONDUCT

Between October 2013 and March 23, 2014, in Colombia, Guatemala, Mexico, and the United States, the Defendant served as a leader and organizer of a drug trafficking organization ("DTO"), coordinating the shipment of multiple tons of cocaine for transport into Los Angeles for further distribution. Memorandum Opinion 2, 14, ECF No. 74.

The Defendant was introduced to Marllory Chacon Rossell ("Chacon Rossell"), a high-level Guatemalan drug trafficker, then known as "the Queen of the South,"[1] in October 2013 *Id*. at 1. Between October 29, 2013, and February 18, 2014, the Defendant met with Chacon Rossell to negotiate purchasing between 500 and 1,000 kilograms of cocaine.[2] *Id*. at 2. Chacon Rossell, unbeknownst to the Defendant, was a Drug Enforcement Administration ("DEA") informant who agreed to record these meetings.[3] *Id*.

The Defendant demonstrated fluency and familiarity with the tactics employed by major drug traffickers during his meetings with Chacon Rossell, including the use of violence to protect narcotics shipments.[4] *Id*. The Defendant also explained how he organized his operation, recruited and oversaw security guards, pilots, and "working teams" to insulate himself from exposure to criminal liability.[5] *Id*. at 2–3, 8–9.

The Defendant was contemporaneously communicating with Alfonso Limon-Sanchez ("Limon-Sanchez"), a close affiliate of the co-leader of the Sinaloa Cartel, regarding the transaction and other matters during the latter stages of his negotiation with Chacon Rossell.[6] *Id*. at 2–3. On or before January 2014, a judicially authorized wiretap began intercepting BlackBerry Messenger ("BBM") communications between Limon-Sanchez and the Defendant.[7] *Generally id*.

---

[1] Gov't Ex. 100-1A (still photo from first meeting at Chacon Rossell's residence on Oct. 29, 2013).

[2] *See* ECF No. 67 (Evid. Hr'g Tr., Jun. 13, 2024) at 81:13-25, 82:1-12, 123:13-15, 164:7-11; ECF No. 68 (Evid. Hr'g Tr., Jun. 14, 2024) at 203:7-15, 243:9-16; *see also* Gov't Exs. 100-1, 101-1, 102-1A, 103-1A, 103-2A (videos of recorded meetings at Chacon Rossell's residence on Oct. 29, 2013, Oct. 30, 2013, Feb. 5, 2014, and Feb. 18, 2014).

[3] ECF No. 67 at 34:16-18, 81–82.

[4] *See generally* Gov't Ex. 102-1T (Certified Transcription and Translation of recorded meeting on Feb. 5, 2014); Gov't Ex. 103-3T (Certified Transcription and Translation of recorded meeting on Feb. 18, 2014); ECF No. 67 at 154.

[5] *See, e.g.,* Gov't Exs. 102-1T at 42:704-705 (pilots); 103-3T at 6:79-81 (working teams), 19:260 (insulating himself from exposure).

[6] Gov't Exs. 2–28 (BBM intercepts).

[7] *See* Gov't Exs. 2–28.

at 2. The Defendant provided updates and sought guidance regarding the negotiations with Chacon Rossell in his near daily communication with Limon-Sanchez.[8] *Id.* at 3. Limon-Sanchez granted the Defendant significant discretion, allowing him to remain in control and take the lead in coordinating and finalizing the deal with Chacon Rossell.[9] *Id.* at 3, 12. Intercepted communications also reveal a separate 166-kilogram cocaine transaction, where the Defendant and Limon-Sanchez planned a 50-50 split of the drugs.[10] *Id.* at 3.

On February 17, 2014, United States law enforcement targeted three of the Defendant's seven Los Angeles stash houses, seizing $1.4 million in cash and 74 kilograms of cocaine.[11] *Id.* at 3–4. The day after the raids, the Defendant complained to Chacon Rossell about learning that morning that three of his seven Los Angeles stash houses were "busted."[12] *Id.* at 4.

The Defendant nonetheless proceeded with the Chacon Rossell transaction. *Id.* at 4. The deal was secured for a total of 1,830 kilograms of cocaine priced at $13,000 per kilogram.[13] On February 22, 2014, the Defendant was intercepted by Guatemalan law enforcement while traveling in a truck borrowed from Chacon Rossell,[14] carrying 498 bricks of recently purchased cocaine,

---

[8] *See* Gov't Exs. 2–28.

[9] *See* Gov't Ex. 6 at 1:4 (Limon-Sanchez stating "I'll leave it to you if you're able to establish a relationship").

[10] Gov't Ex. 9:5-7; ECF No. 67 at 31:17-19.

[11] ECF No. 67 at 58–63; Gov't Ex. 200-23 (photograph of bulk cash seized in Los Angeles on Feb. 17, 2014); Gov't Ex. 200-09 (photograph of packaged cocaine seized in Los Angeles on Feb. 17, 2014).

[12] Gov't Ex. 103-3T at 4:40, 4:48–52.

[13] Gov't Ex. 18:5-6; ECF No. 67 at 42:22-25.

[14] Gov't Ex. 103-3T at 36:554–58.

and was subsequently arrested.[15] *Id*. at 4. A total of 514 kilograms of cocaine was seized.[16] *Id*. at 4.

## II.    **PROCEDURAL HISTORY**

On March 13, 2014, a federal grand jury sitting in the District of Columbia returned an indictment charging the Defendant with conspiracy to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine, knowing and intending that the cocaine would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B)(ii), 963 and 18 U.S.C. § 2. ECF No. 1. The Defendant was arrested in Mexico in June 2016 and subsequently extradited to the United States. On August 2, 2021, the Defendant made his initial appearance in the United States District Court for the District of Columbia and was ordered detained. Min. Order, Aug. 2, 2021.

The Defendant filed a Notice of Intent to Enter a Plea of Guilty to Count One of the Indictment on March 31, 2024. ECF No. 62. The next day, the Defendant entered a guilty plea to Count One of the Indictment without a plea agreement and stipulated to the essential elements of the offense. Min. Entry, Apr. 1, 2024; ECF No. 62.

On June 13 and June 14, 2024, the Court presided over an evidentiary hearing, where the Government presented evidence and testimony of two witnesses, Jamie Dvorsky, a Special Agent of the Federal Bureau of Investigation ("FBI"), and Chacon Rossell, who had become a cooperating defendant. ECF Nos. 67-68. The hearing's purpose was to resolve factual disputes related to aggravating role adjustments for sentencing. Min. Entry, Apr. 11, 2024. The Court

---

[15] ECF No. 67 at 71–73.
[16] Gov't Ex. 201-29T at 13 (results of controlled substance analysis performed by Guatemalan authorities and provided in response to a request for Mutual Legal Assistance); Gov't Ex. 201-23 (overview photograph of cocaine seized by Guatemalan authorities).

concluded that "the Government has met its burden to demonstrate that Defendant operated as a leader or organizer meriting a four-level aggravating role increase." ECF No. 74, at 1. Consequently, the Court found Defendant ineligible for adjustments under the zero-point offender and safety valve provisions. *Id.* Sentencing was scheduled for June 9, 2025. ECF No. 75.

### III.    <u>STATUTORY PENALTIES</u>

The Defendant is now set to be sentenced on the sole count of the Indictment. The Defendant faces a maximum sentence of life imprisonment, a mandatory minimum sentence of ten years' imprisonment, a fine up to $10,000,000, and supervised release term of at least five years. ECF No. 80 (Presentence Investigation Report or "PSR") ¶¶ 78, 94. The Defendant is not eligible for safety valve relief, pursuant to U.S.S.G. § 2D1.1(b)(18), or zero-point offender treatment, pursuant to U.S.S.G. §4C1.1(a) and (b). ECF No. 74, at 1; ECF No. 80 ¶ 41.

### IV.    <u>THE PRESENTENCE INVESTIGATION REPORTS AND GUIDELINES ANALYSIS</u>

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.*

The Probation Office issued its final and revised PSR on May 2, 2025. ECF 80. The Probation Office calculated the applicable Guidelines range as:

| | | |
|---|---|---|
| <u>Base Offense Level</u>: | 38 | U.S.S.G. §§ 2D1.1(a)(5) and (c)(1) |
| Adjustment for Role in the Offense | +4 | U.S.S.G. § 3B1.1(a) |
| Acceptance of Responsibility | - 2 | U.S.S.G. § 3E1.1(a) [17] |

---

[17] The Probation Office agreed with the Government that the Defendant did not qualify for a one-level reduction pursuant to U.S.S.G. § 3E1.1(b). ECF No. 80 at 9 n.4. The Defendant is not entitled

| | |
|---|---|
| Total Offense Level | 40 |
| Criminal History Category | I |
| Guidelines Range | 292 – 327 months |

*Id.* ¶¶ 33, 36, 39, 42, 45, 79.

The aggravating role enhancement disqualifies the Defendant from reductions under the safety valve and zero-point offender provisions. ECF No. 80 ¶ 41; ECF No. 74 at 1. The Government agrees with the Probation Office's Guidelines calculations in all parts but for its application of a two-level reduction under U.S.S.G. § 3E1.1(a).

**A.  The Defendant has not clearly shown acceptance of responsibility for his offense.**

The Defendant is not eligible for a two-level reduction for acceptance of responsibility. Section 3E1.1 of the Guidelines provides for a two-level offense level reduction "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." The defendant bears the burden to demonstrate, through an affirmative recognition of responsibility, that he is entitled to the acceptance of responsibility downward adjustment. *United States v. Rashad*, 396 F.3d 398, 403 (D.C. Cir. 2005). A "favorable recommendation of the probation officer does not relieve him of the burden." *United States v. McLean*, 951 F.2d 1300, 1302 (D.C. Cir. 1991). Nor does entering a guilty plea entitle a defendant to an adjustment as a matter of right; a court can consider whether a defendant falsely denies or frivolously contests an adjustment. *United States v. Saani*, 650 F.3d 761, 767, 768 (D.C. Cir. 2011); *see also* U.S.S.G § 3E1.1 Application Note 1(A) ("[a] defendant

---

to a one-level reduction pursuant to U.S.S.G. § 3E1.1(b) because he pleaded guilty after the parties' last pre-trial conference, shortly before the commencement of a multi-week jury trial; after numerous pre-trial motions had been decided by the Court; and after the Government had committed and expended significant resources in preparation for trial.

who falsely denies … relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility[.]")

This Circuit has held that "[i]t is not error for a district court to require an acceptance of responsibility that extended beyond the narrow elements of the offense to all of the circumstances surrounding the defendant's offense." *United States v. Leyva*, 916 F.3d 14, 28 (D.C. Cir. 2019) (citation and internal quotation marks omitted). In *Leyva,* the defendant denied being a leader of a DTO and challenged the sentencing enhancement under U.S.S.G. § 3B1.1(a). *Id.* The district court applied the enhancement, finding evidence that the defendant was a leader, and then denied a downward adjustment for acceptance of responsibility. *Id.* at 21. The D.C. Circuit upheld the district court's denial of adjustment for acceptance of responsibility, reasoning that the defendant "cannot accept responsibility for his conduct and simultaneously contest the sufficiency of the evidence that he engaged in the conduct." *Id.* at 28-29.

Similar to *Leyva*, the Defendant seeks an acceptance of responsibility adjustment while falsely minimizing and frivolously contesting his leadership role in the conspiracy. The evidence was clear: the Defendant managed a complex cocaine distribution network; he had the authority to directly negotiate the purchase of tonnage quantities of cocaine from a major Guatemala-based drug trafficker; he coordinated payment, security, and transport of shipments from Guatemala to his base of operations and warehouses in Culiacán; he oversaw and was responsible for the delivery of cocaine to his U.S.-based "offices" in Los Angeles.

The Defendant has singularly failed to accept responsibility for his offense and relevant conduct. This Court should follow the reasoning in *Leyva* and Application Note 1(A) to U.S.S.G. § 3E1.1 and determine that he is ineligible for a two-level adjustment under U.S.S.G. § 3E1.1(a). For these reasons, the Court should deny the additional two-level reduction for acceptance of

responsibility and calculate the applicable Guidelines range as follows:

| | | |
|---|---|---|
| <u>Base Offense Level</u>: | 38 | U.S.S.G. §§ 2D1.1(a)(5) and (c)(1) |
| Adjustment for Role in the Offense | +4 | U.S.S.G. § 3B1.1(a) |
| <u>Total Offense Level</u> | 42 | |
| Criminal History Category | I | |
| Guidelines Range | 360 – life | |

**B.  Response to Defendant's Objections to the Presentence Investigation Report**

The Defendant made four objections to the PSR following the evidentiary hearing challenging the factual support for a leadership enhancement. Because the Court ruled that the Defendant held a leadership role in the crime, there is no reason to respond to the Defendant's Objections #1-#4.

With the Defendant's role in the offense settled, only Defendant's Objection #5 remains. The Defendant denies that he "earned millions of dollars in gross proceeds as a result of his own drug trafficking conduct" in PSR ¶ 29. This objection should also be overruled. The Government's evidence was sufficient to establish that the Defendant had substantial financial resources at his disposal, allowing him to absorb a $1.4 million dollar loss in Los Angeles on Monday, and complete negotiations for the purchase of $4 million worth of cocaine in Guatemala on Tuesday. *See, e.g.*, Gov't Ex. 102-1T at 33:565-567 (the Defendant explaining to Chacon Rossell during the February 5, 2014, meeting, "[t]here is capital for some five or six [tons of cocaine] … It's spread out. There's five hundred (500) in New York, there's a thousand (1,000) in Los Angeles, there's a thousand (1,000) in Culiacan. We have some in the DF.[18]"). The Defendant was purchasing tonnage quantities of cocaine and claimed to have access to significant capital and resources.

---

[18] "DF" refers to Mexico City. *See* ECF No. 68 at 214:2-8.

Though the Court noted the limited available evidence "of the broader scheme and Defendant's assets," it also concluded that it would not be "unreasonable to assume that Defendant received a significant share of the profits arising from splitting cocaine purchases with Limon-Sanchez." ECF No. 74 at 15.

## V.    <u>SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)</u>

After calculating the applicable Guidelines range, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In doing so, [a district court] may not presume that the Guidelines range is reasonable. [A district court] must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 49-50 (citation and footnote omitted).

In determining the appropriate sentence, the statute directs courts to consider the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). Further, courts are directed to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Although courts may not presume that the appropriate sentence necessarily lies within the Guidelines range, "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6.

The relevance of the Guidelines throughout the sentencing process stems in part from the fact that, while advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50. In this case, as described below, all § 3553(a) factors weigh in favor of the recommended 360-month sentence.

### A. Nature and Circumstance of the Offense and Need for the Sentence to Reflect the Severity of the Offense

The Defendant committed a serious crime against the United States. He controlled a DTO that conspired to transport large quantities of cocaine throughout multiple countries for ultimate importation into the United States. He directly and personally negotiated the purchase of 500 kilograms of cocaine. He then coordinated payment, transportation, and security for the shipment, which was destined for the United States.

The Defendant controlled multiple "offices" within the United States, by his own account to Chacon Rossell during their recorded meetings, seven in Los Angeles, California. He oversaw and coordinated the delivery of multi-hundred-kilogram cocaine shipments to those offices, which served as his U.S.-based distribution network. The Defendant supervised the personnel staffing those offices. Those offices received their cocaine supplies from the Defendant, housed and further distributed the cocaine, and repatriated the sale proceeds to the Defendant and his DTO.

The Defendant's conduct furthered the violence, corruption, and harm inherent to illicit narcotic trafficking. Considering the nature and circumstances of this conspiracy, including the

Defendant's role, the type and quantity of drugs distributed in this conspiracy, a 360-month sentence reflects the seriousness of the offense, promotes respect for the law, and provides just punishment.

### B. The History and the Characteristics of the Defendant

The Defendant chose to become a major narcotrafficker in spite of his upbringing, education, and professional experience which afforded other life options. The Defendant was born into and raised by an intact family. ECF No. 80 ¶ 51. His parents taught him and his siblings good morals and emphasized the value of education. ECF No. 80 ¶ 55. The Defendant completed the equivalent of a high school education in Mexico, attended (but did not complete) flight school, and completed six semesters towards a bachelor's degree. ECF No. 80 ¶ 67. The Defendant was gainfully employed prior to and during the conspiracy's duration. He was a private business owner with three retail cellular phone stores, and later as a self-employed real estate agent and broker. ECF No. 80 ¶¶ 70–72. These facts demonstrate that the Defendant was not a victim of circumstance who resorted to narcotics trafficking to survive. Instead, the Defendant turned to narcotics trafficking for profit and greed.

The Defendant has never suffered from any mental or emotional health issues, substance abuse issues, or significant physical health issues. ECF No. 80 ¶¶ 61–63, 65–66. The Defendant has a common-law spouse (age 39) with whom he has four children (ages 19, 15, 9, and 9). ECF No. 80 ¶ 56. The Defendant's wife has symptoms of thyroid disease, but otherwise, his wife and children are in good physical health and the children are enrolled in school. ECF No. 80 ¶¶ 57, 64.

The Government believes that a sentence of 360 months is appropriate considering the Defendant's choice to forgo lawful and promising opportunities, and instead, as this Court noted, to "play a significant role in planning a broad scope of illegal activity." ECF No. 74 at 8.

### C.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B)-(C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others.  18 U.S.C. § 3553(a)(2)(B). Cartels and transnational drug trafficking wreak havoc at each step in their operation and supply chain. Drug trafficking has led to widespread corruption and violence, and destroys communities, families, and lives.  A significant sentence signals to existing traffickers, prospective traffickers, and all involved with illicit narcotic trafficking that punishment by the U.S. criminal justice system is certain and severe.

### *Specific Deterrence*

The Defendant knowingly joined a conspiracy to transport massive amounts of cocaine throughout Central America for ultimate import to the United States. The Defendant's repeated disregard for the law and the criminal justice system necessitates a significant sentence.

On February 17, 2014, United States law enforcement raided three of the Defendant's distribution nodes in California. Undeterred, after "three of [his] offices . . . were busted"[19] the Defendant nonetheless continued transacting with Chacon Rossell, and four days later took custody of a 500-kilogram load. When Guatemalan authorities arrested him on February 22, 2014, the Defendant fled to Mexico while on bond. The Defendant has gone to great lengths to falsely minimize his role as a leader within his organization and to deny responsibility for trafficking in

---

[19] Gov't Ex. 103-3T at 4:40.

tonnage quantities of cocaine he purchased from Guatemala-based suppliers and transported to his U.S.-based distribution nodes in Los Angeles. The Defendant exhibits a clear pattern of not only flagrantly disregarding the law but also sustaining his criminal conduct when confronted with any consequences and denying responsibility when held to account.

As mentioned above, the Defendant did not turn to criminal conduct out of necessity, nor was he unaware of the harm his actions caused. Instead, he pursued drug trafficking as a profitable business opportunity. The financial incentives and the Defendant's repeated attempts to evade justice strongly suggest a high risk of recidivism. Given his history and his deliberate choice to engage in drug trafficking, only a substantial sentence will effectively deter him from committing future crimes. A 360-month sentence will achieve the necessary specific deterrence.

### D.  Unwarranted Sentencing Disparities

Section 3553(a)(6) articulates "the need to avoid *unwarranted* sentence disparities among defendants *with similar records* who have been found guilty of *similar conduct*." 18 U.S.C. § 3553(a)(6) (emphasis added). When determining whether a sentence creates an unwarranted disparity, the Court should also consider a defendant's acceptance of responsibility, the nature and extent of a defendant's participation in the criminal activity, a defendant's criminal history, and whether and to what extent a Defendant cooperated. *See, e.g., United States v. Mejia*, 597 F. 3d 1329, 1344 (D.C. Cir. 2010) (concluding that difference in sentences was "entirely explained" by co-defendant's acceptance of responsibility and thus any disparity resulting from defendant's "harsher" sentence was not unwarranted). A defendant is only entitled to "a weighing of the section 3553(a) factors that are relevant to [his] case, not to a particular result." *United States v. Carrasco-De-Jesus*, 589 F.3d 22, 29 (1st Cir. 2009).

Section 3553(a)(6) does not require that the sentencing judge engage in a case-by-case comparison. *See* 18 U.S.C. § 3553(a)(6). Rather, this sentencing provision is aimed at protecting against national disparities, and courts have held that "the guidelines themselves are almost certainly the best indication of ordinary practice since most sentences are within the guidelines." *United States v. Saez*, 444 F.3d 15, 18-19 (1st Cir. 2006); *see also United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006); *United States v. Gallegos*, 129 F.3d 1140, 1143 (10th Cir. 1997); *United States v. Hall*, 977 F.2d 861, 863-64 & n.4 (4th Cir. 1992); *United States v. LaSalle*, 948 F.2d 215, 218 (6th Cir. 1991); *United States v. Joyner*, 924 F.2d 454, 460-61 (2d Cir. 1991).

The Government has identified similar cases, discussed below, which demonstrate the recommended 360-month sentence would not result in unwarranted sentencing disparities based on a totality of the circumstances. In selecting these cases, the Government considered the defendants' conduct, applicable Guidelines range, criminal histories, and ultimate sentencing disposition. The Government also considered the similar procedural background of the selected cases; each defendant pled guilty without a plea agreement, challenged offense conduct, and contested applicable sentencing enhancements. As each case presents unique aspects and circumstances, the examples below are not intended to provide precise comparators, but to inform the basis for the Government's recommendation in this case.

## 1. *Alfredo Beltran Leyva*[20]

Alfredo Beltran Leyva ("Leyva") operated as a leader and organizer of a DTO with close ties to the Sinaloa Cartel, purchasing cocaine from Colombian manufacturers and directing a large-scale narcotics transportation network, involving the use of land, air and sea transportation throughout Central America and Mexico for eventual import into the United States. Leyva also

---

[20] 916 F.3d 14 (D.C. Cir. 2019).

produced and trafficked methamphetamine. Leyva's resulting Guidelines range was life imprisonment; the government recommended life, and the court sentenced him to life.

Like the Defendant, Leyva pled guilty on the eve of trial without a plea agreement. Prior to sentencing, Leyva moved to withdraw his guilty plea. "He argued that his plea was 'not knowing or voluntary' because the trial court 'did not fully follow the procedures that [Federal Rule of Criminal Procedure 11] states must be followed' during the plea colloquy." 916 F.3d 14, at 21. The district court denied the motion, but rather than accepting the parties' stipulated guidelines range, the district court ordered an evidentiary hearing to resolve the contested factual issues.

Leyva ultimately was held accountable for more than 450 kilograms of cocaine and over 50 kilograms of methamphetamine, resulting in a base offense level of 38. Leyva possessed a firearm, warranting a two-level adjustment pursuant to U.S.S.G. § 2D1.1(b)(1); used violence, made a credible threat to use violence, or directed the use of violence, resulting in a two-level adjustment pursuant to U.S.S.G. § 2D1.1(b)(2); and bribed law enforcement to facilitate commission of the offense, thus a two-level increase was applied pursuant to U.S.S.G. § 2D1.1(b)(11). Finally, a two-level enhancement was added, pursuant to U.S.S.G. § 2D1.1(b)(15)(C), because the Leyva's conduct warranted an adjustment under U.S.S.G. § 3B1.1 and because Leyva was directly involved in the importation of a controlled substance. Leyva was deemed an organizer or leader of criminal activity that involved five or participants or was otherwise extensive, resulting in a four-level adjustment pursuant to U.S.S.G. § 3B1.1(a).

Both Leyva and the Defendant pled guilty only after extensive pre-trial litigation, and after the government had allocated substantial resources to prepare for trial. Leyva's request to withdraw his guilty plea presumptively required the government to present evidence to establish applicable sentencing enhancements. Leyva thus exhausted government resources by minimizing

his role in the offense, raised factually and legally incorrect procedural challenges, and attempted to withdraw his guilty plea.

Both the Defendant and Leyva operated as leaders within their DTOs, they trafficked in substantial quantities of cocaine, and falsely minimized their roles. Though Leyva's total offense level was greater than the Defendant's due to multiple additional enhancements, these cases are procedurally indistinguishable, and the government similarly opposed the adjustment for acceptance of responsibility. Because Leyva's total offense level was greater, it is appropriate that the Defendant be given a lesser but closely commensurate sentence.

### 2.  *Gerardo Gonzalez-Valencia*[21]

Gerardo Gonzalez-Valencia ("Gonzalez-Valencia") was the leader of a powerful Mexican DTO, known as Los Cuinis,[22] and, in that capacity, Gonzalez-Valencia conspired to distribute thousands of kilograms of cocaine for importation into the United States and Europe.

Gonzalez-Valencia pled guilty without a plea agreement to conspiracy to distribute five kilograms or more of cocaine knowing and intending that the cocaine would be unlawfully imported into the United States. Gonzalez-Valencia submitted a barebones Statement of Facts and proposed Sentencing Guidelines that grossly understated the extent of his involvement in the drug trafficking conspiracy and the scope and nature of that conspiracy.

"After extensive briefing, a three-day evidentiary hearing involving six witnesses, and a separate sentencing hearing, the district court sentenced Gonzalez-Valencia to life imprisonment." 2025 WL 1085168, at *2. Gonzalez-Valencia was held accountable for well over 450 kilograms

---

[21] No. 16-CR-065-BAH, 2025 WL 1085168 (D.C. Cir. Apr. 11, 2025).

[22] Los Cuinis is closely aligned with the Cártel de Jalisco Nueva Generación (CJNG), one of the largest and most violent DTOs currently operating in Mexico, due in part to the familial relationship with the leader of the CJNG, Nemesio Oseguera Cervantes, also known as "El Mencho," who is Gonzalez-Valencia's brother-in-law.

of cocaine, resulting in a base offense level of 38. Gonzalez-Valencia possessed a firearm, warranting a two-level adjustment pursuant to U.S.S.G. § 2D1.1(b)(1); used violence, made a credible threat to use violence, or directed the use of violence, resulting in a two-level adjustment pursuant to U.S.S.G. § 2D1.1(b)(2). Like the Defendant, Gonzalez-Valencia and was an organizer or leader of criminal activity that involved five or participants or was otherwise extensive, resulting in a four-level adjustment pursuant to U.S.S.G. § 3B1.1(a).

Both the Defendant and Gonzalez-Valencia operated as leaders responsible for the purchase and transport of more than 450 kilograms of cocaine. Both entered guilty pleas only after substantial pre-trial litigation and allocation of substantial resources toward preparation for trial, without a plea agreement, and contesting applicable sentencing enhancements. Though the government did not contest the three-point adjustment for acceptance of responsibility, with a criminal history category of III and total offense level of 45, his resulting Guidelines range was life imprisonment.

Because Gonzalez-Valencia's total offense level was greater than the Defendant's due to multiple additional enhancements, it is appropriate that the Court impose a lesser but comparable sentence.

### 3. *Raul Flores Hernandez*[23]

Raul Flores Hernandez ("Flores Hernandez") was the leader of an influential Mexican DTO, and, in that capacity, he conspired to distribute thousands of kilograms of cocaine for importation into the United States. Flores Hernandez and his DTO were closely aligned with leaders of the most prolific and violent cartels of their time, including the Sinaloa Cartel, the Beltran Leyva Organization, the Milenio Cartel, and the Cártel de Jalisco Nueva Generación

---

[23] 17-CR-051-BAH (D.D.C. Jan. 12, 2024).

("CJNG"). The Defendant was able to navigate these alliances, shifting over time, for more than three decades to benefit from their patronage, powerful protection, and sources of supply.

Flores Hernandez pled guilty to conspiracy to distribute five kilograms or more of cocaine knowing and intending that the cocaine would be unlawfully imported into the United States. In pleading guilty without a plea agreement, Flores Hernandez submitted a barebones Statement of Facts that grossly understated the extent of his involvement in the drug trafficking conspiracy.

Following a three-day evidentiary hearing, the court applied a four-level aggravating role enhancement under U.S.S.G. § 3B1.1(a) and credited Flores Hernandez with a three-level reduction for acceptance of responsibility, resulting in a Guidelines range of 262 to 327 months, and ultimately sentenced Flores Hernandez to the low end, 262 months' imprisonment. Statement of Reasons, No. 17-cr-051 (BAH), ECF 88.

Flores Hernandez and the Defendant in the instant matter are virtually indistinguishable procedurally and factually. The only difference is the court's application of a three-level reduction for acceptance in Flores Hernandez's case. But for this factor, the resulting Guidelines ranges would have otherwise been identical. For the reasons discussed in Section IV.A *supra*, the Court asks the Court to follow the reasoning set out by the D.C. Circuit in *Leyva*, 916 F.3d 14, 28 ("he cannot accept responsibility for his conduct and simultaneously contest the sufficiency of the evidence that he engaged in that conduct.").

## VI.    CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court sentence the Defendant to a total term of imprisonment of 360 months, five years of supervised release, and the mandatory $100 special assessment.

Respectfully submitted,

Marlon Cobar, Chief
Narcotic and Dangerous Drug Section
U.S. Department of Justice
Washington, D.C. 20530

By:    /s/*Douglas Meisel*
Douglas Meisel
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
Washington, D.C. 20530
Telephone: (202) 598-2281
Douglas.meisel@usdoj.gov

19

## <u>CERTIFICATE OF SERVICE</u>

 I hereby certify that a copy of the foregoing Memorandum in Aid of Sentencing was served to defense counsel on May 14th, 2025, via CM/ECF.


      By: <u>/s/ *Douglas Meisel* </u>
         Douglas Meisel
         Trial Attorney
         U.S. Department of Justice
         Narcotic and Dangerous Drug Section